Jennifer Sarnelli
**GARDY & NOTIS, LLP**
560 Sylvan Avenue, Suite 3085
Englewood Cliffs, NJ 07632
Telephone: 201-567-7377
Facsimile: 201-567-7337
Email:  jsarnelli@gardylaw.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN MELDON, Derivatively on Behalf of FRESHPET, INC., | |
| Plaintiff, | |
| v. | Civil Action No.: 18-cv-10166 |
| RICHARD THOMPSON, RICHARD KASSAR, SCOTT MORRIS, CATHAL WALSH, THOMAS FARINA, STEPHEN MACCHIAVERNA, MICHAEL HIEGER, CHARLES A. NORRIS, CHRISTOPHER B. HARNED, DARYL G. BREWSTER, ROBERT C. KING, JONATHAN S. MARLOW, J. DAVID BASTO, LAWRENCE S. COBEN, PH.D., WALTER N. GEORGE III, and CRAIG D. STEENECK, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| FRESHPET, INC., | |
| Nominal Defendant. | |

Plaintiff John Meldon ("Plaintiff"), by his undersigned counsel, submits this Verified Stockholder Derivative Complaint on behalf of nominal defendant Freshpet, Inc. ("Freshpet" or the "Company") against certain current and former officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, and corporate waste. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Freshpet and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, stockholder communications, and postings on Freshpet's website concerning the Company's public statements; (d) pleadings, papers, and documents filed in the related pending securities fraud class action, *Curran vs. Freshpet, Inc., et al.*, No. 2:16-cv-02263 (D. N.J.) (the "Securities Class Action"); and (e) review of other publicly available information concerning Freshpet and the Individual Defendants (as defined below). Pursuant to Local Rule 10.1, the names and addresses of the parties are as follows:

**Plaintiff**

John Meldon
60 N. Water St.
New Bedford, MA 02740

**Defendants**

Nominal Defendant Freshpet, Inc.
400 Plaza Drive, 1st Floor
Secaucus, New Jersey 07094

Defendants:  Richard Thompson,
Richard Kassar, Scott Morris,
Cathal Walsh, Thomas Farina,
Stephen Macchiaverna, Michael
Hieger, Charles A. Norris,
Christopher B. Harned, Daryl G.
Brewster, Robert C. King, Jonathan S.
Marlow, J. David Basto, Lawrence S.
Coben, Ph.D., Walter N. George III,
and Craig D. Steeneck
400 Plaza Drive, 1st Floor
Secaucus, New Jersey 07094

## NATURE AND SUMMARY OF THE ACTION

1.     Freshpet is a manufacturer and marketer of natural, fresh foods, refrigerated meals, and treats for dogs and cats.  Freshpet's products are sold to consumers in the United States, Canada, and the United Kingdom through a network of Company-owned branded refrigerators, known as Freshpet Fridges, which are located in grocery stores and other retail outlets.  Freshpet's retail customers include Petco, PetSmart, Target, BJ's Wholesale Club, and Walmart.  Freshpet's revenues are directly dependent on the number of Freshpet Fridges installed at retail outlets.

2.     Freshpet's stock has been publicly traded since November 2014.  From March 2015 through November 2015 (the "Relevant Period"), the Individual Defendants, defined below, disseminated false and misleading guidance to the public

3

concerning Freshpet's business outlook.  The false statements touted Freshpet's as having a positive outlook, although the Individual Defendants knew that structural and financial problems at three major retailers would result in a decrease in the number of Freshpet Fridges and, therefore, lower-than-projected revenues.  The Individual Defendants also knew that Freshpet was experiencing production issues that prevented it from keeping Freshpet Fridges stocked at many locations, resulting in customer-relations problems with its retail customers.  The Individual Defendants knew that manufacturing problems also resulted in producing certain products at margins that were significantly below projections.

3.     While Freshpet's stock price was artificially inflated due to the false and misleading statements, three of the Individual Defendants sold millions of dollars' worth of Freshpet stock in a secondary public offering.  Further, four of the Individual Defendants were associated with Freshpet's largest stockholder, private equity firm MidOcean Partners ("MidOcean"), which also sold millions of shares of stock in the public offering at inflated prices.

4.     As alleged herein, the Individual Defendants knew or should have known that the public documents and statements issued or disseminated in the name of the Company, as outlined below, were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance

4

or dissemination of such false and misleading statements or documents in breach of their fiduciary duties.  The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Freshpet, their control over, and/or receipt and/or modification of Freshpet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Freshpet, participated in the fraudulent scheme alleged herein, in breach of their fiduciary duties and for their own personal financial gain.

5.      Specifically, the Individual Defendants were motivated to engage in a fraudulent course of conduct to allow certain Company insiders and others to sell over 7 million shares of their personally-held Freshpet common stock in the Company's secondary public offering for gross proceeds of over $140.8 million.

6.      The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the deceptions alleged herein.

7.      As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Freshpet has sustained damages as described below.

## JURISDICTION AND VENUE

8.      Diversity jurisdiction is conferred by 28 U.S.C § 1332.  Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business or maintaining operations in this District or is an individual who is a citizen of New Jersey or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

10.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is a current stockholder of Freshpet.  Plaintiff has continuously held Freshpet common stock at all relevant times.  Plaintiff is a citizen of the Commonwealth of Massachusetts.

12.     Nominal Defendant Freshpet is a Delaware corporation with its principal place of business at 400 Plaza Drive, 1st Floor, Secaucus, New Jersey. Freshpet is a citizen of Delaware and New Jersey.  In December 2010, private equity firm MidOcean made a significant equity investment in Freshpet and became its largest stockholder.

6

13.     Defendant Richard Thompson ("Thompson") was a member of the Board from December 2010 through 2016.  He served as FreshPet's Chief Executive Officer ("CEO") from January 2011 through his resignation on July 1, 2016. Thompson sold over 50,000 shares of Freshpet stock in the Company's April 30, 2015, secondary offering (the "Secondary Offering"), for proceeds of over $1,000,000.  Thompson is a citizen of Pennsylvania.

| Date | Insider | Shares | Type | Transaction | Proceeds[1] |
|------|---------|--------|------|-------------|-------------|
| May 5, 2015 | Richard Thompson | 15,828 | Direct | Sale at $20.34 per share | $322,000 |
| May 5, 2015 | Richard Thompson | 34,980 | Indirect | Sale at $20.34 per share. | $711,000 |

14.     Defendant Richard Kassar ("Kassar") has served as Freshpet's Chief Financial Officer since January 2011.  He was the CEO from July 2006 through January 2011, and President from January 2011 through June 2014.  Kassar sold over 30,000 shares of Freshpet stock in the Secondary Offering for proceeds of over $600,000.  Kassar is a citizen of New York.

| Date | Insider | Shares | Type | Transaction | Proceeds |
|------|---------|--------|------|-------------|----------|
| May 5, 2015 | Richard Kassar | 9,000 | Direct | Sale at $20.34 per share | $183,000 |
| May 5, 2015 | Richard Kassar | 21,300 | Indirect | Sale at $20.34 per share | $433,000 |

15.     Defendant Scott Morris ("Morris") is a co-founder of Freshpet.  He has served as President since March 2016, and as Chief Operating Officer since July

---

[1] All sales figures estimated based on the average of multiple prices reported.

2015.  Morris was Chief Marketing Officer from January 2014 to July 2015, and Senior Vice President of Sales and Marketing from 2010 to 2013.  According to the Company's website, Morris is involved in all aspects of Company development and day-to-day operations.  Morris sold over 50,000 shares of Freshpet stock in the Secondary Offering, for proceeds of over $1,000,000.  Morris is a citizen of New Jersey.

| Date | Insider | Shares | Type | Transaction | Proceeds |
|---|---|---|---|---|---|
| May 5, 2015 | Scott James Morris | 48,381 | Direct | Sale at $20.34 per share | $984,000 |
| May 5, 2015 | Scott James Morris | 3,874 | Indirect | Sale at $20.34 per share | $79,000 |

16.    Defendant Cathal Walsh ("Walsh") is a co-founder of Freshpet and has served as Senior Vice President of Cooler Operations since January 2011.  He served as the Company's Chief Operating Officer from October 2006 to January 2011.  As shown in the chart below, Walsh sold over 35,000 shares of Freshpet stock in the Secondary Offering, for proceeds of $736,000.  Walsh is a citizen of New Jersey.

| Date | Insider | Shares | Type | Transaction | Proceeds |
|---|---|---|---|---|---|
| May 5, 2015 | Cathal Walsh | 36,195 | Direct | Sale at $20.34 per share | $736,000 |

17.    Defendant Thomas Farina ("Farina") has served as the Company's Senior Vice President of Sales since January 2013.  He served as its Eastern Region Vice President from 2006 to 2013.  Farina sold 15,000 shares of Freshpet stock in the Secondary Offering for proceeds of $305,000.  Farina is a citizen of New Jersey.

8

| Date | Insider | Shares | Type | Transaction | Proceeds |
|---|---|---|---|---|---|
| May 5, 2015 | Thomas Farina | 15,000 | Direct | Sale at $20.34 per share | $305,000 |

18.     Defendant Stephen Macchiaverna ("Macchiaverna") has served as Freshpet's Senior Vice President, Controller, and Secretary since October 2006. Macchiaverna sold over 10,000 shares of Freshpet stock in the Secondary Offering for proceeds of over $200,000.  Macchiaverna is a citizen of Connecticut.

| Date | Insider | Shares | Type | Transaction | Proceeds |
|---|---|---|---|---|---|
| May 5, 2015 | Stephen Macchiaverna | 10,050 | Direct | Sale at $20.34 per share | $204,000 |

19.     Defendant Michael Hieger ("Hieger") has served as Freshpet's Senior Vice President of Manufacturing Operations since January 2014.  He was the Company's Vice President of Manufacturing Operations from 2007 to 2013.  In addition to plant-wide day-to-day activities, he is involved in new product development and co-manufacturing operations.  Hieger sold over 1,000 shares of Freshpet stock in the Secondary Offering for proceeds of $23,000.  Hieger is a citizen of Pennsylvania.

| Date | Insider | Shares | Type | Transaction | Proceeds |
|---|---|---|---|---|---|
| May 5, 2015 | Michael Hieger | 1,118 | Direct | Sale at $20.34 per share | $23,000 |

20.     Defendant Charles A. Norris ("Norris") has been chairman of the Board since October 2006.  Norris is the managing member of Freshpet Investors LLC, an

entity that sold over two million shares of Freshpet stock in the Secondary Offering. Norris is a citizen of California.

| Date | Insider | Shares | Type | Transaction | Proceeds |
|------|---------|--------|------|-------------|----------|
| May 5, 2015 | Charles Norris | 2,490,170 | Indirect | Sale at $20.34 per share | $50,650,000 |

21.   Defendant Christopher B. Harned ("Harned") has been a member of the Board since October 2006, and was a member of the Board's Audit Committee during the Relevant Period.  He also served as the Company's Vice Chairman from October 2006 to December 2010.  Harned is also an investor in Freshpet Investors LLC.  Harned is a citizen of Wisconsin.

22.   Defendant Daryl G. Brewster ("Brewster") has been a member of the Board since January 2011.   Between 2009 and 2013, Mr. Brewster was a Management Advisor to MidOcean.  Brewster is a citizen of New Jersey.

23.   Defendant Robert C. King ("King") has been a member of the Board since November 2014.  King is a citizen of California.

24.   Defendant Jonathan S. Marlow ("Marlow") has been a member of the Board since December 2010.  Marlow is a Principal at MidOcean, and has been with the firm since 2009, where he has focused on investments within the consumer sector.  Marlow is a citizen of New York.

25.   Defendant J. David Basto ("Basto") has been a member of the Board since December 2010, and a member of the Board's Audit Committee during the

Relevant Period.  Basto is Managing Director of Carlyle Equity Opportunity Fund, and previously co-founded Broad Sky Partners in 2013.  Prior to co-founding Broad Sky Partners, Basto worked for MidOcean from its inception in 2003 through 2013, most recently as Managing Director and co-head of MidOcean's consumer sector investing team.  Basto is a citizen of New York.

26.     Defendant Lawrence S. Coben, Ph.D. ("Coben") has been a member of the Board since November 2014.  He is also an investor in Freshpet Investors LLC. Coben is a citizen of New York.

27.     Defendant Walter N. George III ("George") has been a member of the Board since November 2014.  George is a citizen of Missouri.

28.     Defendant Craig D. Steeneck ("Steeneck") has been a member of the Board since November 2014, and was a member of the Board's Audit Committee during the Relevant Period.  Steeneck is a citizen of New Jersey.

29.     The defendants identified above in paragraphs 13 through 28 are referred to herein as the "Individual Defendants."

30.     The defendants identified above in paragraphs 20 through 28 comprise the majority of Freshpet's current Board of Directors[2] and are referred to herein as the "Director Defendants."

---

[2]  The tenth member of the Board is newly appointed, William Cyr.  Mr. Cyr was appointed CEO and director of Freshpet in September 2016.  He is not named as a defendant in this Complaint.

31.    Defendants Thompson, Kassar, Morris, Walsh, Farina, Macchiaverna, Hieger, and Norris are referred to herein as the "Insider Selling Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary duties of good faith, trust, loyalty, and due care.  The Individual Defendants were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies,

practices, and controls of the Company.  By virtue of such duties, the officers and directors of Freshpet were required to, among other things:

a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b)      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules, and regulations.

35.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

36.     The Company maintains a General Code of Ethics (the "Code").  The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Freshpet and its subsidiaries.

37.     The purpose of the Code is to deter wrongdoing and to promote the conduct of all Company business in accordance with high standards of integrity and in compliance with all applicable laws and regulations.

38.     The Code provides:

## INTRODUCTION

The purpose of this General Code of Ethics (the "Code") is to provide a framework for making ethical business decisions in the course of Freshpet, Inc.'s (the "Company") business, to establish the importance of exercising sound, ethical judgment and to recognize the shared values we have with our customers, stockholders, team members, suppliers and other third parties with whom we do business. All directors, officers, team members and agents of the Company, and members of their immediate family, are subject to the Code (each such person is sometimes referred to in this Code as "you."

\*       \*       \*

## GENERAL PRINCIPLES

The Company expects and requires you to adhere to the following standards of conduct:

•       Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships in accordance with law and the Company's policy regarding conflicts of interest;

•       Full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (or investors) and in other public communications made by the Company;

•       Compliance with applicable governmental laws, rules and regulations and the Company's policies;

•       The prompt internal reporting to an appropriate person or persons (or use of the Company's anonymous, confidential reporting system) identified in the Code of violations of the Company's policies; and

•       Accountability for adherence to the Code.

\*       \*       \*

15

## I.    POLICIES AND PRACTICES

### A.    Compliance with Laws

You must obey the laws of the jurisdictions in which the Company operates.  Where necessary, seek guidance from your supervisor or the Chief Financial Officer ("CFO").  No person has authority to violate any law or to direct others to violate any law on behalf of the Company. You should also refer to the additional policies that the Company has in place.

### B.    Conflicts of Interest

A conflict of interest may arise where your loyalties are divided, or appear to be divided, between your business interests and those of the Company.  The Company expects that you will not knowingly place yourself in a position that would have the appearance of being, or could be construed to be, in conflict with the Company's interests.

*        *        *

### D.    Securities Laws

It is your obligation to safeguard the Company's non-public information and not to share this information with anyone except as required by your work responsibilities.  Non-public information is information that has not been disclosed or made available to the general public.   Such information may include financial data, plans for acquisitions, material contracts, or the hiring, firing or resignation of a member of the Board of Directors or an officer of the Company. Trading in stocks or securities based on non-public information, or providing nonpublic information to others so that they may trade, is illegal and may result in prosecution.  The trading of stock by directors, officers and team members of the Company is subject to compliance with applicable laws and the Company's Statement of Policy to All Company Personnel Concerning Securities Trading and Disclosure of Confidential Information.  Team members having questions about the sale or purchase of a security that might involve nonpublic information or securities laws should review the Company's Statement of Policy to All Company Personnel Concerning Securities Trading and Disclosure of Confidential Information and then consult the CFO. Just as the

16

Company values and protects its own nonpublic information, we respect the non-public information of other companies.

39.     The Company also maintains an additional code of ethics for executive

officers and principal accounting personnel.  This additional code states, in part:

**FRESHPET, INC.**
**CODE OF ETHICS FOR EXECUTIVE OFFICERS**
**AND PRINCIPAL ACCOUNTING PERSONNEL**

Freshpet, Inc. (the "Company") maintains a General Code of Ethics (the "General Code") applicable to all directors, officers, employees and agents of the Company and its subsidiaries.  The General Code covers ethical conduct, including conflicts of interest and compliance with law. In addition, the Chief Executive Officer, the Chief Financial Officer, the principal accounting officer or controller and all persons performing similar functions for the Company (the "Senior Financial Employees") shall be subject to the following additional specific policies (the "Code of Ethics for Senior Financial Officers"):

1.     All Senior Financial Employees shall exhibit and promote the highest standards of honesty and ethical business conduct including acting in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing their independent judgment to be subordinated.  All Senior Financial Employees shall establish, maintain and support policies and procedures that encourage and reward professional integrity in all aspects of the Company's organization and shall ensure an environment exists within the Company which eliminates inhibitions and barriers to responsible behavior, such as coercion, fear of reprisal, or alienation from other employees within the Company.

2.     All Senior Financial Employees are responsible for full, fair, accurate, timely and understandable disclosures in the reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and other regulators, and in other public communications made by the Company.  Accordingly, it is the responsibility of each Senior Financial Employee promptly to bring to the attention of the Chief Financial Officer or the Audit Committee of the Board of Directors any material information of which he or she may

17

become aware that affects the disclosures made by the Company in its public filings and to otherwise assist in fulfilling the responsibilities as specified in the Company's policies and procedures regarding financial reporting and disclosure.

40.     Moreover, on November 13, 2014, the Board adopted Corporate Governance Guidelines (the "Guidelines") to assist the Board in the exercise of its duties and responsibilities and to serve the best interests of the Company and its stockholders.

41.     Pursuant to the Guidelines, director responsibilities include, but are not limited to, the following:

**1.      BOARD RESPONSIBILITIES**

**(a)      Responsibilities of the Board**

The business of the Company is conducted by management under the direction of the Chief Executive Officer (the "CEO").  The Board's responsibility is to oversee, on behalf of stockholders, the conduct of the Company's business, to provide advice and counsel to the CEO and senior management, to protect the Company's best interests and to foster the creation of long-term value for stockholders.

Among other things, the Board's decision-making responsibilities include:

(i)      Review and approval of the Company's plans, strategies, objectives and policies, as developed by the CEO and senior management;

(ii)      Approval of director candidates recommended by the Nominating and Corporate Governance Committee for election by stockholders at the Annual Meeting; and

(iii)      Approval of material investments or divestitures, strategic transactions, related party transactions and other significant transactions not in the ordinary course of the Company's business.

18

Among other things, the Board's oversight responsibilities include monitoring and/or making inquiries concerning:

(i)     The Company's performance in relation to its plans, strategies, financial and non-financial objectives;

(ii)    The performance and effectiveness of the Company's management team;

(iii)   Succession and development plans for key Company executives, including the CEO;

(iv)    The various committees of the Board;

(v)     Through the Audit Committee, evaluating the integrity of the Company's accounting and financial reporting systems, including the audit of the Company's annual financial statements by the independent auditors, and that appropriate systems of control are in place.  The Audit Committee reports to the Board on a regular basis and the Board, upon the recommendation of the Audit Committee, takes the actions that are necessary to ensure the integrity of the Company's accounting and financial reporting systems and that appropriate controls are in place; and

(vi)    The Company's compliance with legal and regulatory requirements.

In carrying out their responsibilities, Board members will exercise their business judgment and act in ways that they reasonably believe will serve the best interests of the Company and its stockholders.  As appropriate, the Board may also consider the interests of other stakeholders, including employees, customers, lenders and the members of the communities in which the Company operates.

**(b)    Expectations of Board Members**

Board members are expected to:

(i)     Become and remain informed about the Company, its business and its industry;

(ii)   Attend all meetings of the Board and of Board committees on which they serve, having read and considered any materials distributed in advance of the meeting; and

(iii)   Participate constructively in Board and committee meetings, drawing upon their individual experience, knowledge and background, as appropriate, to provide perspectives and insights.

\*       \*       \*

## 4.   DIRECTOR ACCESS TO MANAGEMENT AND INDEPENDENT ADVISORS

### (a)   Access to Management

Directors shall have full and unrestricted access to any relevant Company records and may request that any officer or other employee of the Company or the Company's outside counsel or accountants meet with any members of, or consultants to the Board or any committee.  As a courtesy, directors will exercise their judgment to ensure that this access does not impede or interfere with the conduct of the Company's business and is coordinated, where possible, through the CEO, so as not to undermine normal lines of management authority.

### (b)   Access to Independent Advisors

In their sole discretion, the Board and each of its committees shall have the sole authority and responsibility to select, employ, retain and terminate any financial, legal, executive search, consulting and other professional advisors as they deem necessary or appropriate to assist in the discharge of their responsibilities.  The Company shall pay the professional fees and reasonable expenses of any such independent advisors retained by the Board or any of its committees.

42.   Finally, per the Audit Committee's Charter (the "Audit Committee Charter"), "the Committee's primary purpose is to provide assistance to the Board in fulfilling its oversight responsibility relating to the integrity of the Company's financial statements and its financial reporting process; the systems of internal

accounting and financial controls; the performance of the Company's internal audit function, if any, and independent auditor; the independent auditor's qualifications and independence; and the Company's compliance with legal and regulatory requirements."

43.    Moreover, as noted in the Company's Proxy Statement:

The Audit Committee is responsible for, among other matters: (1) appointing, compensating, retaining, evaluating, terminating and overseeing our independent registered public accounting firm; (2) discussing with our independent registered public accounting firm their independence from management; (3) reviewing with our independent registered public accounting firm the scope and results of their audit and the audit fee; (4) approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm, including taking into consideration whether the independent auditor's provision of any non-audit services to us is compatible with maintaining the independent auditor's independence; (5) overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual consolidated financial statements that we file with the SEC; (6) reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements; (7) establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters; (8) reviewing and approving related person transactions; (9) annually reviewing the Audit Committee charter and the committee's performance; and (10) handling such other matters that are specifically delegated to the Audit Committee by our Board of Directors from time to time.

44.    In violation of the Audit Committee Charter and their general duties as members of the Audit Committee, defendants Steeneck, Harned, and Basto (the "Audit Committee Defendants"), who were members of the Audit Committee,

21

conducted little, if any, oversight of the Company's internal controls over public reporting of its financial statements, consciously disregarded their duties to monitor such controls over financial reporting, and consciously disregarded their duties to protect corporate assets.   The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's stockholders, which were not in the Company's best interest.

45.   In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act of 1934 ("Exchange Act") and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Freshpet to make false and misleading statements regarding the Company's financial condition, and about Freshpet maintaining adequate internal controls.

46.     Each of the Individual Defendants further owed to Freshpet and its stockholders the duty of loyalty, requiring that each favor Freshpet's interests and that of its stockholders over their own while conducting the Company's affairs, and refrain from using their position, influence, or knowledge of the Company's affairs to gain personal advantage.

## SUBSTANTIVE ALLEGATIONS

47.     Defendant Freshpet is a manufacturer and marketer of natural fresh foods, refrigerated meals, and treats for dogs and cats in the United States, Canada, and the United Kingdom.  Freshpet's products are sold to consumers through a network of Company-owned branded refrigerators, known as Freshpet Fridges, which are located in grocery stores and other retail outlets.

48.     The Company has represented that the Freshpet Fridges give it a competitive advantage over other pet food because they: (i) "replace standard shelving in the pet aisle or an end-cap of a retail store"; (ii) guarantee the Company "exclusive shelf space in the pet department of leading national retail chains"; (iii) are a "brightly-lit and highly-visible merchandising platform" and allow the Company to control how the "brand is presented to consumers at the point of sale"; and (iv) retailers achieve an "average cash-on-cash payback period of less than 15 months" because "Freshpet grows sales of their overall pet category, drives higher traffic, increases shopper frequency and delivers category leading margins."

49.     The Company's growth strategy is linked exclusively to its ability to increase the number of Freshpet Fridges in retail stores across North America.  As of April 1, 2015, the beginning of the Relevant Period, the Company had installed Freshpet Fridges in over 13,000 stores.

50.     On March 31, 2015, after the close of the market, Freshpet issued a press release announcing its financial results for the fourth quarter and full year ending December 31, 2014.  For the year, the Company reported net sales of $86.8 million, gross margin of 48.7%, and adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") of $5.5 million.     Defendant Thompson, commenting on the results, stated, in pertinent part:

> We are pleased to report strong top-line growth for Freshpet in our first quarter as a public company, driven by increased velocity and distribution across our retail channels.  We believe our solid results reflect our customers' growing desire to feed their pets fresh, natural food.  We are pleased with the improvements we achieved in fiscal 2014, which demonstrate our ability to successfully execute on our strategic initiatives to grow our company and create value for our shareholders.  Going forward, we believe these improvements will assist us in reaching our expectations for 2015 and beyond.[3]

51.     With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

---

[3]  Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

Outlook

For full year 2015 the Company expects:

- Net sales of $112.0 to $114.5 million, an increase of 29% to 32%, compared to 2014.

- Adjusted EBITDA of $16.0 to $17.5 million an increase of $10.5 to $12.0 million compared to 2014.

- Freshpet Fridges of approximately 15,100 to 15,600, an increase of approximately 13% to 17%, compared to 2014.

52.     After the earnings announcement, Freshpet held a conference call with analysts and investors to discuss the Company's earnings release and operations. With regard to the Company's outlook for the first quarter of 2015 and full year 2014, defendant Kassar stated:

We expect quarter-one Freshpet fridges of approximately 14,000, representing an increase of approximately 19.9%, and quarter-one net sales growth of approximately 37% to $26.5 million compared to quarter-one of 2014. We expect adjusted EBITDA of approximately $2 million, an increase of approximately $1.2 million versus quarter-one of 2014.

As a reminder, quarter-four is historically when we have the lowest media spend. For example, in quarter-one 2015, we spent approximately $3.3 million on media compared to quarter-four of 2014, when we spent approximately $50,000. It is important to note that on an absolute basis, we do not expect to spend more on media in 2015 when compared to 2014.

For full-year 2015, we expect Freshpet fridges in the range of 15,100 to 15,600, representing an increase of approximately 13% to 17% compared to the prior year. We project our net sales to be in the range of $112 million to $114.5 million, representing an increase of 29% to 32% versus 2014, and adjusted EBITDA to be in the range of $16 million to $17.5 million.

53.     In response to questions regarding the growth of its Freshpet Fridge

locations, defendants Morris and Thompson stated:

> From a fridge standpoint, so we got off to a good start in the year, and
> we are looking for it to continue to develop at, I would say, a similar
> pace to how we saw the year develop last year.  What we want to make
> sure we are doing is we are guiding to really what we know versus what
> we think.  And you'll see that reflected in the fridge location guidance
> for the year, the [15.1 to 15.6] that we quoted.

> *        *        *

> BILL CHAPELL: Got it. And then -- and I appreciate the color.  As
> you look at kind of the cooler count for this year and the expansion, I
> imagine by now, you have pretty good visibility of where each cooler
> is going to go.  I mean, can you give us some more color there in terms
> of mass versus grocery or higher velocity versus lower velocity?  And
> also maybe any new customers you expect to see out of that mix next
> year?

> RICHARD THOMPSON: Yes, Bill.  We've got -- we are very excited
> about where we are with our customers, and the momentum we have in
> all the areas, in new products, in sales, our velocity -- which, again, as
> I've said it before, but I'm very excited about the velocity, where we
> are headed here.

> The store count is obviously growing.  But the main focus is obviously
> velocity, velocity, velocity.

> But Scott, why don't you -- you can just talk about the stores, where
> they are going.

> SCOTT MORRIS: Yes, sure.  So, I think, as we had anticipated the way
> it looks like it's going to come in this year, it will be heavier
> development in grocery and mass partners.  In addition, as you guys are
> well aware, we do have visibility out several months, but we also don't
> exactly know what's going to develop over the next kind of 30, 60 and
> 90 days.  And that's kind of why we gave a guidance where this is what
> we know versus what we think.

Now, over the 30 and 60, 90 days that we are going to kind of see, there could be some significant opportunities to come in, but we don't know those yet. And we didn't want to put in our -- out a number that we may be incorrect on.

RICHARD THOMPSON: Yes. And I just want to be very clear, Bill -- we are very confident, highly confident of our numbers this year for especially the velocity and the sales that we have this year. So, the store count is important for sure, but the velocity is -- and sales are what our top priority are.

***So we are very confident that we are going to be where we need to be by the end of the year. And we've got some new retailers that we are not in right now that we are having serious discussions with, that we are very excited about, that unfortunately, until we are actually in, I don't want to be able to use their names. But we've got some new guys that we are not in right now that we are excited about getting into here shortly.***

54.     In reaction to these announcements, over the next six trading days, the price of Freshpet common stock rose from $19.43 per share on March 31, 2015, to $25.46 per share on April 9, 2015 – an increase of 31%.

55.     On April 27, 2015, the Individual Defendants caused Freshpet to issue a press release announcing that it commenced the Secondary Offering of 5,313,351 shares of its common stock held by defendants Thompson, Morris, and Norris and other Freshpet insiders, including MidOcean. In connection with the Secondary Offering, the Individual Defendants caused Freshpet to file a registration statement with the SEC dated April 13, 2015 (the "Registration Statement"). The Registration Statement failed to disclose the adverse facts detailed herein.

56.     On April 29, 2015, the Individual Defendants caused Freshpet to issue a press release announcing the public offering price of its 5,313,351 shares of its common stock at $21.47 per share.

57.     On May 7, 2015, the Individual Defendants caused Freshpet to issue a press release announcing its financial results for the first quarter of 2015, ending March 31, 2015.  For the quarter, the Company reported net sales of $27.1 million, gross margin of 49.0%, adjusted EBITDA of $2.0 million, and 14,019 active Freshpet Fridges.  Defendant Thompson commented on the results, in pertinent part:

> We believe we are off to a great start in 2015 and our first quarter performance reflects strong sales velocity across each of our retail channels. We are pleased to see this quarter's sales performance exceed our initial plans, due in part to a solid performance of our consumer marketing initiative. Pet parents have continued to choose Freshpet's simple, natural foods to feed their pets, helping us grow significantly faster than the category.

58.     Regarding the Company's outlook, the press release stated:

Outlook

The Company reiterated its guidance for 2015. For full year 2015, excluding any potential incremental impact associated with the Freshpet Baked test product, the Company expects the following full year results compared to prior year:

- Net sales of $112.0 to $114.5 million, an increase of 29% to 32%.

- Adjusted EBITDA of $16.0 to $17.5 million an increase of $10.5 to $12.0.

- Freshpet Fridges of approximately 15,100 to 15,600, an increase of approximately 13% to 17%.

28

59.     After the earnings announcement, Freshpet held a conference call with

analysts and investors to discuss the earnings announcement and the Company's

operations.   In response to questions concerning the Company's guidance of

Freshpet Fridge store locations, defendants Morris, Thompson, and Kassar stated:

> ROBERT MOSKOW: Okay. And then just to -- I wanted to check on -
> - there's a couple of major customers of yours that you thought might
> be dragging their feet a little bit in terms of getting new merchandising,
> and just being able to execute the way they normally execute.  Any
> changes in that timing or anything like that? Or are they still in the
> throes of rethinking their broader strategies?  And is that still kind of
> slowing things down, I guess?
>
> SCOTT MORRIS: I think the information that we can definitely share
> is that **_we do feel consistently good about the range in stores that --_**
> **_the guidance that we gave on the last call, the 15,100 to 15,600, and_**
> **_Dick just reiterated it._**   There are a handful of retailers that have had
> some challenging times this year.  There always are.  And we're waiting
> on a couple of reasonable sized opportunities that are pending for Q3,
> and I think that will -- depending on how those come through, it will
> put us at different places in the range.
>
> ROBERT MOSKOW: Right. Okay. So, a couple of months ago, I think
> that's what you said, so there's no new news on that front in terms of
> that?
>
> RICHARD THOMPSON: No, no.  But I can assure you, Rob, we keep
> working hard every day.  And every day, we make more and more
> contacts, and everybody loves what we're doing.
>
> *     *     *
>
> MATTHEW LARSON: That's great to hear.  Well, we'll stay tuned.
> Just one additional one.  Could you speak to what you're seeing as far
> as velocity gains across your footprints?  Any additional color by
> channel where you are seeing the strongest growth?

SCOTT MORRIS: Typically where we see the most significant increases in velocity are the channels that are outperforming the category. So, you start at the top in pet specialty. We typically get a little bit better performance; our stronger same-store sales growth. Right under that you have mass, and then grocery. And that's a very -- if you look at the growth rates across those channels, it's pretty similar. What I mean by that is if you look at the growth rates in pet, those are going to be the highest; mass is going to be second; and grocery is going to be slightly lower.

So, outperforming in pet and mass; and mass and then grocery is kind of the last on the list. And Whole Foods and natural is a clear outlier for us. We are seeing terrific numbers coming from them.

*     *     *

BILL CHAPELL, ANALYST, SUNTRUST ROBINSON HUMPHREY: Any way to characterize the doors to date, the new coolers to date, between mass and specialty and what have you, just as we look on the velocity going forward for this year?

SCOTT MORRIS: To date, through Q1, about two-thirds of the stores -- yes, right around two-thirds of the stores in Q1 were mass. And the vast majority of the rest of them were in grocery. And we anticipate the mix shifting more towards grocery and mass throughout the back of the year. Most of the time -- or basically what we're expecting to see is we'll see those numbers -- or the stores that we're adding -- being consistent with our average run rate across mass and grocery. So we don't expect the mix of those stores to have any significant impact either way.

BILL CHAPELL: And just as I look at the door count and your guidance for this year, I would imagine with a six-, nine-month lead time for orders, do you have a pretty good idea of where we're going to fall out at this point? How much upside potential can there be?

RICHARD KASSAR: Hey, Bill, we're just going to stay with the guidance we've got, so that's where we're at. ***We appreciate the question, but we are very confident we will be in our guidance range.***

60.   On August 11, 2015, the Individual Defendants caused Freshpet to issue a press release announcing its financial results for the second quarter of 2015, ending June 30, 2015.  For the quarter, the Company reported net sales of $28.4 million, adjusted EBITDA of $2.8 million, and Freshpet Fridges of 14,354. Defendant Thompson commented on the results as follows:

> Our mission to provide simple, natural foods continues to resonate with pet parents and has propelled our strong performance in the first six months of 2015.   In the second quarter, net sales increased approximately 39% reflecting improved sales velocity across each of our retail channels and enabled us to achieve increased adjusted EBITDA.  We continue to make strategic investments in increasing manufacturing capacity and in future sales growth to support the tremendous opportunities ahead of us.

61.   With regard to the Company's outlook, the press release stated:

> The Company reiterated its guidance for 2015.  For full year 2015, excluding any potential incremental impact associated with the expanded test of the Company's Freshpet Baked product, the Company expects the following full year results compared to prior year:

- Net sales of $112.0 to $114.5 million, an increase of 29% to 32%.

- Adjusted EBITDA of $16.0 to $17.5 million an increase of $10.5 to $12.0.

- Freshpet Fridges of approximately 15,100 to 15,600, an increase of approximately 13% to 17%.

62.   After the earnings announcement, Freshpet held a conference call with analysts and investors to discuss the earnings release and the Company's operations. With regard to the Company's outlook, defendant Kassar stated:

For the full year 2015, I'll reiterate our previously disclosed guidance. We continue to expect Freshpet Fridges in the range of 15,100 to 15,600, representing an increase of approximately 13% to 17% compared to the prior year. We project our net sales, excluding Freshpet Baked test product, to be in the range of $112 million to $114.5 million, representing an increase of 29% to 32% compared to 2014. And adjusted EBITDA, excluding Freshpet Baked test product, to be in the range of $16 million to $17.5 million, an increase of $10.5 million to $12 million compared to 2014.

63.     The statements alleged in paragraphs 50 through 53, 55, and 57 through 62 were false and misleading. By early 2015, the Individual Defendants were aware of significant obstacles to Freshpet's ability to grow and meet its revenue projections, including:

a)     PetSmart, BJ's and Walmart had each expressed concerns about Freshpet's products. A&P, a major Freshpet retailer, filed for bankruptcy in the first half of 2015 and Target closed all 133 of its Canadian stores in April 2015;

b)     Freshpet was experiencing significant manufacturing products with its "shredded" product. Because Freshpet was using equipment not designed for the product, it was replacing equipment faster than expected;

c)     Due to manufacturing issues and a fire at one facility, Freshpet produced its baked product at margins significantly lower than expected; and

d)     Freshpet was fined by BJ's in the summer of 2015 for not maintaining sufficient frozen products. In the first half of 2015, Freshpet was on the verge of being fined by Walmart for not keeping its products in stock, which limited Freshpet's growth opportunities with Walmart.

64.     After the market closed on November 11, 2015, the Individual Defendants caused Freshpet to issue a press release announcing its financial results

for the third quarter of 2015, ending September 30, 2015. For the quarter, the Company reported net sales of $30.6 million, adjusted EBITDA of $2.3 million, and 14,760 active Freshpet Fridges. The Company stated that the:

> decrease in gross profit margin was due to lower margin contribution from the Company's Freshpet Baked test product, which reduced third quarter 2015 gross margin by approximately 100 basis points. In addition, manufacturing throughput constraints associated with new product innovation as well as start-up costs from the implementation of new manufacturing processes further reduced gross margin by approximately 140 basis points.

Defendant Thompson commented on the results as follows:

> In the third quarter, net sales increased 36%, driven by increased velocity per fridge, demonstrating continued consumer demand for Freshpet's simple, natural pet foods. We made meaningful progress across several areas of our business, however, we experienced lower than expected Freshpet Fridge growth and our gross margin was negatively affected by manufacturing inefficiencies from new product innovation and the near term cost of adjusting processes on our primary products. As a result, we have updated our annual guidance to reflect these headwinds, and are intently focused on the execution of our operational and financial objectives. Going forward, we will further improve our manufacturing costs and processes, drive greater leverage across our business model and in turn, enhance long-term shareholder value.

65. With regard to the Company's outlook, the Individual Defendants slightly upgraded their guidance for net sales and revised downward their guidance for adjusted EBITDA and Freshpet Fridges. In that regard, the Company's outlook was revised as follows:

|  | **Initial Guidance** | **Revised Guidance** |
|---|---|---|
| **Net sales** | $117.0 to $119.5 million | $115.5 million to $117.0 million |
| **Adjusted EBITDA** | $12.5 to $14.0 million | $10.0 million to $11.0 million |
| **Freshpet Fridges** | 15,100 to 15,600 | 14,900 to 15,000 |

66.     After the earnings announcement, the Company held a conference call with analysts and investors.  With regard to the Company's disappointing third quarter results and lowered guidance for the year, defendant Thompson stated:

> The third quarter sales increased approximately 36% to $30.6 million, driven by increased velocity growth per fridge.  Our sales growth continued to outpace the distribution growth of Freshpet Fridges which increased 13% year-over-year to 14,670 locations.  ***As we previously communicated, we expect that our 2015 Freshpet Fridge location growth to be closer to the low-end of our full year guidance of 15,100 to 15,600.***
>
> As we have gained more visibility, we now anticipate to end the year with approximately 15,000 Freshpet Fridges.  ***We believe that the difference from our original guidance range to where we expect to end the year will be approximately $2.4 million in lost sales.  The recent bankruptcy of two grocery retailers has also impacted our fridge count and sales by approximately 100 locations.***
>
> While we are of course disappointed that we must temper our expectations for bridge growth near-term, this does not deter our confidence in Freshpet long-term growth opportunities.  Time and time again we have seen the addition of a Freshpet Fridge grow the overall pet category attract new consumers, increase shopping frequency and provide category leading retail margins.  This continues to be a strong value proposition for retailers and we still believe on average and over the next several years, the approximate 2,000 fridges on an annualized basis is achievable long-term.

As those familiar with our Company know, our Freshpet Fridge allows us to control critical real estate while truly differentiating our product at the point-of- purchase.  As we own and maintain them, our Freshpet Fridges are key barriers to entry.  This provides us with a unique Freshpet brand ambassador in every location.

The introduction of innovative new products in a diverse portfolio are important to driving sales growth and increased velocity.  Our innovation team and our developments this year have been tremendous, and we are very pleased with the consumer response to our new products.

However, production capabilities including the production throughput of our new Freshpet Shredded product has been lower than originally projected, and this limited our anticipated growth contribution and our gross profit margin was negatively impacted in the quarter by approximately 90 basis points.  I am pleased to say that our throughput rates improved a bit in October and early November, and we expect continued flow-through improvements once we begin to see the efficiencies from our upcoming manufacturing plant expansion, with a target completion date of second quarter 2016.

***Earlier this year we communicated our action to increase price on certain Freshpet beef products to help us better absorb the drastic increase in beef commodity cost.  As a result, we have experienced some softening in demand of those products.***

Those products represent approximately 20% of our business and we experienced a 15% reduction or about a $900,000 in sales for Q3, and a $1.5 million for the year-to-date periods.  We have since seen this trend level off with volume currently trending flat to up.

67.     With regard to the Company's gross margins and revised guidance,

defendant Kassar stated:

The following items impacted our gross margin performance in the quarter.

As Richard mentioned, our Freshpet Baked product currently has a gross margin of approximately 30%.  While we do expect this will

35

improve to approximately 35% by the end of the year, this lowered our margin in quarter three by 103 basis points.

In addition, our Freshpet Shredded throughput out of our manufacturing facility, has been lower than our outlook originally projected it, and this resulted in 91 basis point drag to gross margin in the quarter. Finally, we also incurred a charge of $150,000 or 49 basis points from the implementation of new manufacturing processes in the quarter as we continuously look for efficiencies to improve our Freshpet roll production. In sum, these three items negatively impact our gross margin performance in the quarter by approximately 243 basis points.

\*     \*     \*

For the full-year 2015 we are updating our previous guidance. We now expect Freshpet Fridges in the range of 14,900 to 15,000, representing an increase of approximately 11.3% to [12.1%] compared to the prior year (company corrected after the call). As a result, net sales are to be in the range of $115.5 million to $117 million representing an increase of 33% to 35% compared to 2014. Our net sales guidance includes approximately $5 million from the Fresh Baked test product.

Adjusted EBITDA is expected to be in the range of $10 million to $11 million, an increase of $4.5 million to $5.5 million compared to 2015. Including the negative contribution of $3.8 million from the Freshpet Baked product. As a reminder, our adjusted EBITDA represents EBITDA plus loss on disposaled equipment, new plant startup expenses, share-based compensation, launch expense and secondary costs, and warrant expense.

68.    In reaction to these announcements, on November 12, 2015, the price of Freshpet common stock fell $2.09 per share, or 25%, representing a loss of over $70 million in market capitalization.

69.    As a result of the materially false and misleading statements and omissions alleged herein, Freshpet common stock traded at artificially inflated prices during the Relevant Period.

36

70.     The Individual Defendants materially misled the investing public, thereby inflating the price of Freshpet common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make the Individual Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, and operations.

71.     Moreover, the Insider Selling Defendants each profited from the above complained of false and misleading statements.

72.     The Insider Selling Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements.  The Insider Selling Defendants, by virtue of their receipt of information reflecting the true facts regarding Freshpet, their control over, and/or receipt and/or modification of Freshpet's allegedly materially false and misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Freshpet, participated in the fraudulent scheme alleged herein.

73.     The Insider Selling Defendants were further motivated to engage in a fraudulent course of conduct in order to allow themselves and certain Company insiders and others to collectively sell approximately 7 million shares of their personally-held Freshpet common stock in the Company's secondary public offering for gross proceeds of over $140.8 million.

## DAMAGES TO FRESHPET

74.     As a result of the Individual Defendants' wrongful conduct, Freshpet disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.   The improper statements have devastated Freshpet's credibility.   Freshpet has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

75.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Freshpet's market capitalization has been substantially damaged, losing tens of millions of dollars in value as a result of the conduct described herein.

76.     Further, as a direct and proximate result of the Individual Defendants' conduct, Freshpet has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

a)      costs incurred in investigating and defending Freshpet and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

38

b)      and costs incurred from the loss of the Company's customers' confidence in Freshpet products.

77.      By Order entered January 12, 2018, the United States District Court for the District of New Jersey denied Defendants' motion to dismiss in the Securities Class Action.  Freshpet and defendants Thompson, Kassar, Morris, and Norris face a substantial likelihood of liability in that action.

78.      Moreover, these actions have irreparably damaged Freshpet's corporate image and goodwill.  For at least the foreseeable future, Freshpet will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Freshpet's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

79.      Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

80.      Plaintiff brings this action derivatively in its right and for the benefit of Freshpet to redress injuries suffered, and to be suffered, by Freshpet as a direct result of the Individual Defendants' breaches of fiduciary duties.  Freshpet is named as a nominal defendant in this case solely in a derivative capacity.

81.      As alleged above, Plaintiff is currently a Freshpet stockholder.  Plaintiff was also a Freshpet stockholder at the time of the breaches of fiduciary duties

39

complained of herein.  Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

82.    The wrongful acts complained of herein subjected, and continue to subject, Freshpet to harm.

83.    The Board is currently comprised of the following ten individuals: defendants Norris, Harned, Brewster, King, Marlow, Basto, Coben, George, and Steeneck, and non-defendant William Cyr.  Plaintiff did not make a demand upon the Board prior to instituting this action because a majority of the Company's directors either:  (1) lack independence; (2) engaged in (or consciously disregarded) conduct that was not a legitimate exercise of business judgment and/or was *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule; and/or (3) are interested and therefore conflicted from and unable to fairly consider a demand because they face a substantial likelihood of liability for their failure to exercise their fiduciary duties of oversight in good faith.

## DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THE DIRECTOR DEFENDANTS FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

84.    The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the

Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

85.     Moreover, the Director Defendants, as directors (and, in some cases, also as Audit Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

86.     The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and/or failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, all

represent breaches of fiduciary duties for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Freshpet to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, a pre-suit demand is futile.

## DEMAND IS FUTILE AS TO THE AUDIT COMMITTEE DEFENDANTS (STEENECK, HARNED, AND BASTO)

87.    The Audit Committee Defendants were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Freshpet's internal controls over financial reporting, and discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business, operations, prospects, internal controls, and financial statements were accurate.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

42

**DEMAND IS FUTILE AS TO DEFENDANT NORRIS**

88.    In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is additionally futile as to defendant Norris because he cannot disinterestedly consider a demand to bring suit against himself as a named defendant in the Securities Class Action, which alleges that he made many of the same misstatements described above in violation of the federal securities laws. Thus, if defendant Norris were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.  This he will not do.

89.    Demand is also futile as to defendant Norris due to his illegally profiting from insider sales.  Defendant Norris not only disseminated the false and misleading statements complained of above, but with knowledge that the false and misleading statements were causing Freshpet stock to trade at artificially inflated prices, profited from the wrongdoing.  As such, defendant Norris received a financial benefit not shared by other Freshpet stockholders.  Accordingly, demand is futile as to defendant Norris.

**DEMAND IS FUTILE AS TO DEFENDANTS BREWSTER, MARLOW, AND BASTO**

90.    Defendants Brewster, Marlow, and Basto have a longstanding professional relationship having served not only on the Freshpet Board together, but also at MidOcean.  As noted above and in the Company's SEC Form S-1

Registration Statement filed on September 12, 2014, and Amendment No. 3 thereto

filed on November 3, 2014:

- Defendant Basto has been a member of the Freshpet Board since December 2010.  Defendant Basto worked for MidOcean from its inception in 2003 through 2013, most recently as Managing Director and co-head of MidOcean's consumer sector investing team.

- Defendant Marlow has been a member of the Freshpet Board since December 2010.  Defendant Marlow is a Principal at MidOcean, and has been with the firm since 2009, where he has focused on investments within the consumer sector.

- Daryl G. Brewster has been a member of the Freshpet Board since January 2011.  Between 2009 and 2013, Defendant Brewster was a Management Advisor to MidOcean partners.[4]

- MidOcean is a private equity firm focused on investing in middle market companies in North America. MidOcean's targeted sectors include consumer, business & media services and industrial services.  In December 2010, MidOcean and certain of its affiliated entities became Freshpet's largest stockholder.

91.    MidOcean, and by extension defendants Brewster, Marlow, and Basto,

also financially benefited from the Individual Defendants' above-referenced false

and misleading statements.  As shown in the chart below, MidOcean sold 1,750,000

shares of Freshpet stock in the Secondary Offering, at a value of over $35,000,000.

---

[4]  Defendant Brewster's LinkedIn account states he is still a management advisor to MidOcean. *See* https://www.linkedin.com/in/darylbrewster.

| Date | Insider | Shares | Type | Transaction | Value |
|------|---------|--------|------|-------------|-------|
| May 5, 2015 | MidOcean | 1,750,000 | Indirect | Sale at $20.34 per share | $35,595,000 |

92.     This longstanding and extensive professional relationship between defendants Brewster, Marlow, and Basto renders each of them incapable of independently considering a demand to sue one another, rendering demand on these directors futile.

93.     Moreover, demand is futile as to defendants Brewster, Marlow, and Basto because through their association with MidOcean, they illegally profited from the Individual Defendants' false and misleading statements and MidOcean's ability to sell massive amounts of Freshpet stock at artificially inflated prices.

**DEMAND IS FUTILE AS TO DEFENDANTS NORRIS, HARNED, AND COBEN**

94.     Defendants Norris, Harned, and Coben also have a longstanding professional relationship having served not only on the Freshpet Board together, but also as investors in Freshpet Investors LLC.  As noted above and in Amendment No. 3 to the Registration Statement filed on November 3, 2014:

- Mr. Norris serves as a managing member of Freshpet Investors LLC, Mr. Harned and Mr. Coben are investors in Freshpet Investors LLC.

- Charles A. Norris and Kayne Anderson Capital Advisors L.P. are the managing members of Freshpet Investors LLC and share voting and investment power over the shares of common stock held by Freshpet Investors LLC.

- Immediately following the consummation of this offering, MidOcean and Freshpet Investors LLC will own approximately 27.1% and 19.8%, respectively, of our common stock, or 25.9% and 18.9%, respectively, if the underwriters' option to purchase additional shares of our common stock is exercised in full. As a result, MidOcean and Freshpet Investors LLC could potentially have significant influence over all matters presented to our stockholders for approval, including election and removal of our directors, change in control transactions and the outcome of all actions requiring a majority stockholder approval.

- In addition, persons associated with MidOcean and Freshpet Investors LLC currently serve on our Board of Directors. Following this offering, the interests of MidOcean and Freshpet Investors LLC may not always coincide with the interests of the other holders of our common stock, and the concentration of control in MidOcean and Freshpet Investors LLC will limit other stockholders' ability to influence corporate matters.

95.    Freshpet Investors LLC, and by extension defendants Norris, Harned, and Coben, also financially benefited from the Individual Defendants' above-referenced false and misleading statements.  As shown in the chart below, Freshpet Investors, LLC sold close to 2,500,000 shares of Freshpet stock in the Company's April 30, 2015 secondary offering, at a value of over $50,500,000.

| Date | Insider | Shares | Type | Transaction | Value |
|------|---------|--------|------|-------------|-------|
| May 5, 2015 | Freshpet Investors, LLC, | 2,490,170 | Direct | Sale at $20.34 per share. | $50,650,000 |

96.    This longstanding and extensive professional relationship between defendants Norris, Harned, and Coben renders each of them incapable of

independently considering a demand to sue one another, rendering demand on these directors futile.

97.    Moreover, demand is futile as to defendants Norris, Harned, and Coben because through their association with Freshpet Investors LLC, they illegally profited from the Individual Defendants' false and misleading statements and Freshpet Investor LLC's ability to sell massive amounts of Freshpet stock at artificially inflated prices.

### DEMAND IS FUTILE AS TO DEFENDANT HARNED

98.    Defendant Harned has longstanding professional relationships with defendant Thompson and a number of the other Individual Defendants.

99.    Defendant Thompson served as the CEO of The Meow Mix Company LLC ("Meow Mix") from its inception in 2002 through its sale to Del Monte Foods ("Del Monte") in 2006.

100.    Defendant Thompson was not the only Individual Defendant who worked at Meow Mix.  During the same time period, Meow Mix's management team also included defendant Kassar as a Senior Vice President and CFO, defendant Morris as the Vice President of Marketing, defendant Macchiaverna as Controller, defendant Farina as a Vice President, and defendant Hieger as the Engineering Manager.

101.   Defendant Harned served as a Partner with The Cypress Group LLC from 2001 through November 2011, where he directed the firm's investment strategy in the consumer products sector and led the investment in Meow Mix.

102.   Essentially, this group of individuals has been working together for almost 15 years and at multiple companies, moving as a single unit.

103.   In fact, the sales agreement selling Meow Mix to Del Monte was executed by defendants Thompson and Harned and contained the following definition:

> Section 1.3 <u>References to "knowledge"</u>. References in this Agreement to "to the knowledge of Holdings" or phrases of like import are references to the actual knowledge of **Richard C. Thompson**, **Richard Kassar**, Jay Dahlgren, Mike Smith, **Scott Morris**, Mike Larney, John Phelps, **Steve Macchiaverna**, Vir Narula, Sam Noto and **Christopher Harned**.  Knowledge shall be deemed to include information contained in such Person's emails, files, records and correspondence and other materials reviewed in the course of their duties.

(Emphasis added.)

104.   This longstanding and extensive professional relationship between defendants Thompson and Harned, and their ongoing relationships with defendants Kassar, Morris, Macchiaverna, Farina, and Hieger, renders Harned incapable of independently considering a demand to sue one another or many of the other Individual Defendants, rendering demand on defendant Harned futile.

## DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS FOR THE FOLLOWING ADDITIONAL REASONS

105.   If Freshpet's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Freshpet against the Individual Defendants, known as the "insured versus insured exclusion."

106.   As a result, if the Director Defendants were to sue themselves or certain of the officers of Freshpet, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

107.   Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting

Freshpet by prosecuting this action.  Therefore, demand on Freshpet and its Board is futile and is excused.

108.   Freshpet has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

### COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duties

109.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.   The Individual Defendants owed and owe Freshpet fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Freshpet the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

111.   The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

112.   The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose

material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

113.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Freshpet has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

114.   Plaintiff, on behalf of Freshpet, has no adequate remedy at law.

## COUNT II
## Against the Individual Defendants for Waste of Corporate Assets

115.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.   The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

117.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

118.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

119.   Plaintiff, on behalf of Freshpet, has no adequate remedy at law.

## COUNT III
### Against the Insider Selling Defendants for Unjust Enrichment

120.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.   By their wrongful acts and omissions, the Insider Selling Defendants were unjustly enriched at the expense of and to the detriment of Freshpet.

122.   Plaintiff, as a stockholder and representative of Freshpet, seeks restitution from the Insider Selling Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Insider Selling Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and waste of corporate assets;

B.     Directing Freshpet to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and

to protect Freshpet and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

- a provision to permit Freshpet's public stockholders to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Freshpet directors, executives, and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls;

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C.    Awarding to Freshpet restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  June 5, 2018                    **GARDY & NOTIS, LLP**


                                        s/ Jennifer Sarnelli
                                        Jennifer Sarnelli
                                        James S. Notis
                                        **GARDY & NOTIS, LLP**
                                        560 Sylvan Avenue, Suite 3085
                                        Englewood Cliffs, NJ 07632
                                        Telephone: 201-567-7377
                                        Facsimile: 201-567-7337
                                        Email:  jsarnelli@gardylaw.com
                                                jnotis@gardylaw.com

                                        *Liaison Counsel for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
David J. Stone
Melissa A. Fortunato
Todd H. Henderson
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone: 212-308-5858
Email:   stone@bespc.com
         fortunato@bespc.com
         henderson@bespc.com

*Counsel for Plaintiff*

## VERIFICATION

I, John Meldon, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

May 30, 2018

_____

John Meldon